# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

SHERYL FRITZ,
*Plaintiff*,

v.

No. 3:20-cv-01228 (VAB)

KILOLO KIJAKAZI,
ACTING COMMISSIONER OF
SOCIAL SECURITY ADMINISTRATION
*Defendant.*

## RULING AND ORDER ON MOTIONS REGARDING THE COMMISSIONER'S DECISION

Sheryl Fritz ("Plaintiff") has filed this administrative appeal under 42 U.S.C. § 405(g) against Kilolo Kijakazi,[1] the Acting Commissioner of Social Security ("Defendant" or "the Commissioner"), seeking to reverse the decision of the Social Security Administration ("SSA") denying her claim for Title II disability insurance benefits under the Social Security Act. Compl., ECF No. 1 (Aug. 21, 2020) ("Compl.").

Ms. Fritz has moved for an order reversing the decision of the Commissioner, or, in the alternative, an order remanding the case for hearing. *See* Pl.'s Mot. for Order Reversing the Decision of the Commissioner or in the Alternative Mot. for Remand for a Hr'g, ECF No. 15 (Apr. 12, 2021) ("Pl. Mem.").

---

[1] When a party in an official capacity resigns or otherwise ceases to hold office while the action is pending, the officer's successor is automatically substituted as a party, regardless of the party's failure to so move or to amend the caption; the Court may also order such substitution at any time. Fed. R. Civ. P. 25(d); *see also Williams v. Annucci*, 895 F.3d 180, 187 (2d Cir. 2018); *Tanvir v. Tanzin*, 894 F.3d 449, 459 n.7 (2d Cir. 2018). The Clerk of Court therefore will be ordered to change the defendant of the case from Andrew Saul to Kilolo Kijakazi. *See* Social Security Administration, *Dr. Kilolo Kijakazi: Acting Commissioner,* https://www.ssa.gov/agency/commissioner.html (last visited Dec. 9, 2021).

The Commissioner has moved for an order affirming the agency's decision. *See* Def.'s Mot. for an Order Affirming the Decision of the Commissioner, ECF No. 19 (July 12, 2021) ("Gov't Mem.").

For the following reasons, Ms. Fritz's motion is **GRANTED in part** and **DENIED in part**. Ms. Fritz's motion is granted with respect to the motion to remand, but denied as to the motion for an order reversing the decision of the Commissioner.

Accordingly, the Commissioner's motion is **DENIED**. The decision of the Commissioner is **VACATED** and **REMANDED** for rehearing and further proceedings in accordance with this Ruling.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background

Born in 1957, Ms. Fritz had reached the age of fifty-eight at the time of her alleged onset of disability. *See* Tr. of Administrative Proceedings 141, 453, ECF No. 13 (Feb. 12, 2021) ("Tr."). The Administrative Law Judge ("ALJ") found that, within the last fifteen years before the alleged onset of her disability, Ms. Fritz worked as an Auditor (skilled, SVP 8, sedentary exertional level) and a Controller (skilled, SVP 8, sedentary exertional level). *Id.* at 27. The ALJ found that Ms. Fritz is unable to perform any past relevant work, but that there "are jobs that exist in significant numbers in the national economy that [Ms. Fritz] can perform." *Id.*

The ALJ found Ms. Fritz to have the following severe impairments: "thyroid eye disease/Graves' Ophthalmology, diplopia." *Id.* at 18.

### 1.  Medical History

Since 1998, Ms. Fritz has suffered from Graves' disease. *Id.* at 906. She suffers from a "severe limitation of extra ocular motility", a reduced field of vision, double vision (diplopia),

blurry vision, and dry eye. *Id.* at 676, 939, 1175, 1177, 1181, 1185. Between 1998 and 2015, she

had multiple eye surgeries, including orbital decompression, eyelid adjustments, and eye muscle

surgeries, and she "presently has a prism in her right eyeglass lens to control the double vision in

her peripheral vision." *Id.* at 906.

On February 13, 2015, Ms. Fritz underwent re-operation of both lateral rectus muscles.

Ex. 2 to Gov't Mem. at 1–2 ¶ 2, ECF No. 19-2 (July 7, 2021) ("Joint Statement of Facts" or

"JSF"); Tr. at 866.

In July of 2015, Ms. Fritz was in a motor vehicle accident. Tr. at 906. In this accident,

in which Ms. Fritz was driving the vehicle, a truck driver hit the rear end of her car and caused

her car to hit the two cars in front of her. *Id.* This accident caused a cervical injury, concussion,

arthritis, and a herniation of the cervical discs from C3 to C7. *Id.* She presented thereafter with

complaints of neck and shoulder pain, *Id.* at 672, and attended physical therapy between July 28,

2015 and September 11, 201, JSF at 2 ¶ 4; Tr. at 839, 841, 843, 846, 850–51, 853, 855–56, 858.

On August 26, 2015, Ms. Fritz underwent Strabismus surgery, recession/resection for

hypertropia in the right eye. JSF at 2 ¶ 6; Tr. at 762, 845–46. While images now appear closer,

Ms. Fritz's diplopia has continued since the surgery. JSF at 2 ¶ 6; Tr. at 765. She reported that,

as of September 8, 2015, her double vision gave her nausea and headaches. JSF at 2 ¶ 6; Tr. at

769.

As of October 16, 2015, Ms. Fritz had trouble looking into a rearview mirror even with

chin elevation. JSF at 2–3; Tr. at 698. She also experienced blurred vision and aching in her right

eye. JSF at 2–3; Tr. at 698. She felt that her dry eyes were worse. JSF at 2–3; Tr. at 698.

On December 18, 2015, her physician, Tara H. Cronin, M.D. ("Dr. Cronin"), noted that

Ms. Fritz's use of a prism helped her double vision a lot, but noted that she had a very small

window of single binocular vision due to severe restrictive thyroid eye and muscle disease. JSF at 3 ¶ 11; Tr. at 689, 692.

On December 21, 2015, Jonathan E. Silbert, M.D. ("Dr. Silbert") performed a surgical upper eyelid retraction of Ms. Fritz's right eye. JSF at 3 ¶ 10; Tr. at 835–37. In a follow-up appointment for her eyelid retraction, Dr. Silbert noted that Ms. Fritz is at high risk for cornea exposure causing erosion and ulceration, which risks her vision. Tr. at 684; *see also* JSF at 3 ¶ 9; Tr. at 696 ("HIGH risk of cornea exposure causing erosion and ulceration and risking her vision").

On February 29, 2016, Ms. Fritz had an X-ray of her cervical spine that showed 1 mm anterolisthesis of C7 relative to T1, which increases to 4 mm on extension. JSF at 4 ¶ 14; Tr. at 1392. The X-ray also showed multiple degenerative changes in the mid- to lower cervical spine, including large anterior osteopenia to C4-C5, C5-C6, and C6-C7. JSF at 4 ¶ 14; Tr. at 1392.

On March 18, 2016, Dr. Cronin recommended that, "due to severe limitation of extra ocular motility with intractable diplopia and very narrow window with single binocular vision, [Ms. Fritz] is unable to work." JSF at 5 ¶ 17; Tr. at 676.

On March 19, 2016, Ms. Fritz reported that she had developed new radiculopathy in the past month and requested a repeat shoulder girdle trigger point injection. JSF at 5 ¶ 18; Tr. at 826. She reported being active 70% of her daytime hours, but sedentary the rest due to pain. JSF at 5 ¶ 18; Tr. at 826. At Yale New Haven Hospital, she was assessed with cervical degenerative disc disease with right upper extremity radiculopathy. JSF at 5 ¶ 18; Tr. at 826.

On March 22, 2016, Ms. Fritz presented for a comprehensive eye muscle exam with Dr. Cronin, during which she reported improvements with her double vision and eye tiredness; she could take off her glasses and close one eye to read. JSF at 5 ¶ 19; Tr. at 670. Even with this

progress, she continued to have severe limitations of extra ocular motility with a field of a single binocular vision mapped at 8/15. JSF at 5 ¶ 19; Tr. at 670. Dr. Cronin again concluded from this eye examination that Ms. Fritz "cannot work." JSF at 5 ¶ 19; Tr. at 670.

On April 27, 2016, Dr. Cronin completed an American with Disabilities Act ("ADA") Request Accommodation Form, noting that Ms. Fritz has "severe and debilitating diplopia with virtually no window of single binocular vision due to marked extraocular mobility restrictions" and "severe dry eye due to eyelid retraction". JSF at 6 ¶ 21; Tr. at 1175. Dr. Cronin completed similar reports on May 14, 2016 and June 1, 2016. JSF at 6 ¶ 21; Tr. at 1181, 1177.

On June 14, 2016, Ms. Fritz completed an eye exam with Dr. Cronin. JSF at 6 ¶ 21; Tr. at 660. Even with her prism, she had double vision in all gazes, and her prism only worked for central vision. JSF at 6 ¶ 21; Tr. at 660. She could read using one eye "with effort." JSF at 6 ¶ 21; Tr. at 660. She also had pain and burning in her left eye. JSF at 6 ¶ 21; Tr. at 660.

On July 18, 2016, Ms. Fritz received results from X-rays and magnetic resonance imaging (an "MRI") of her cervical spine. JSF at 6; Tr. at 820. The imaging showed multilevel degenerative disc disease and annual tears at C5-C6 and C6-C7. JSF at 6; Tr. at 820. At the time, Ms. Fritz continued to benefit from trigger point injections every three months. JSF at 6; Tr. at 820.

On August 9, 2016 Ms. Fritz reported that she only read using one eye at a time. JSF at 6 ¶ 24; Tr. at 960.

On August 22, 2016, a state agency reviewer, J. Goldberg M.D. ("Dr. Goldberg"), found Ms. Fritz's visual impairment to be non-severe, her degenerative disc disease to be severe, and her hypertension to be non-severe. JSF at 6–7 ¶ 25; Tr. at 148–49.

On November 28, 2016, Ms. Fritz underwent a consultative examination with Patricia Garrett, P.R.N., and Joseph Guarnaccia, M.D., during which she reported upwards of twenty eye surgeries. Tr. at 906. She had multiple scars around both eyes. JSF at 7 ¶ 27; Tr. at 906. During the consultation, Ms. Fritz apparently presented as agile and pleasant, but with a greatly limited and painful range of motion in the cervical spine, as well as neck and shoulder pain. JSF at 7 ¶ 27; Tr. at 908–09.

On December 6, 2016, Dr. Cronin performed an eye muscle check, which revealed dry eyes, double vision, and a very small window of single binocular vision. JSF at 7 ¶ 28; Tr. at 910, 915. Ms. Fritz reported that she used one eye at a time to read and was not reading much. JSF at 7 ¶ 28; Tr. at 910, 915. Again, Dr. Cronin stated that Ms. Fritz could not work. JSF at 7 ¶ 28; Tr. at 910, 915.

On December 14, 2016, Dr. Jonathan Silbert completed a medical source statement, which revealed that Ms. Fritz suffered from eye pain, blurry vision, double vision, and dry eye, and, though her condition had "stabilized," her double vision was "debilitating". JSF at 7 ¶ 29; Tr. at 939.

On December 16, 2016, state agency reviewer Nalini Masih, M.D. ("Dr. Masih"), conducted a residual functional capacity assessment. JSF 7–8 ¶ 30; Tr. at 150–52. Dr. Masih found that Ms. Fritz can occasionally lift up to 20 pounds and frequently lift up to 10 pounds; she can stand and/or walk, and sit, 6 out of 8 hours per day; she can frequently climb ramps and stairs, can balance, and can occasionally stoop, kneel, crouch, and crawl; she can never climb ladders, ropes, or scaffolds; she is limited to occasional overhead reaching; and she should avoid concentrated exposure to machinery and heights. JSF 7–8 ¶ 30; Tr. at 150–52. On August 22,

2017, state agency reviewer Howard Platter, M.D., confirmed this same level of limitation. JSF 9 ¶ 34; Tr. at 165–67.

A medical source statement completed by Dr. Cronin on December 18, 2016 stated that Ms. Fritz is limited in her ability to drive, walk, read, or use a computer; she can occasionally lift up to 20 pounds; she should not do frequent flexing or rotations of her head and neck; she has a visual limitation of disabling diplopia; and she has a lifelong restriction from work of any kind. JSF at 8 ¶ 31; Tr. at 937.

On August 14, 2017, Ms. Fritz underwent a consultative examination with Jeffrey Sandler, M.D. JSF at 8–9 ¶ 33; Tr. at 968–69. Her external examination was remarkable for extreme exophthalmos with marked lid retraction and notable right exotropia. JSF at 8–9 ¶ 33; Tr. at 968–69. Her visual acuity was 20/25 in each eye with correction, and her visual field testing showed a moderate degree of superior and nasal field loss in the right eye. JSF at 8–9 ¶ 33; Tr. at 968–69. Dr. Sandler found the left eye to be essentially normal with the exception of a possible small degree of far superior field deficit. JSF at 8–9 ¶ 33; Tr. at 968–69.

On December 6, 2017, Ms. Fritz again completed an eye exam with Dr. Cronin, which revealed double vision. JSF at 9 ¶ 34; Tr. at 990–95. She also reported aching and tearing eyes JSF at 9 ¶ 34; Tr. at 990–95. She reported that she uses eye drops every couple of hours and gel at bedtime. JSF at 9 ¶ 34; Tr. at 990–95.

On January 22, 2018, Ms. Fritz presented for an orthoptic evaluation where she reported no double vision with her current prism on her distance glasses. JSF at 9 ¶ 37; Tr. at 980.

On February 22, 2018, Ms. Fritz had a bone density scan that showed osteopenia in the lumbar spine carrying a moderate fracture risk, which had significantly worsened from the prior exam. JSF at 9 ¶ 38; Tr. at 1024.

On February 26, 2018, Ms. Fritz presented with swollen eyes bilaterally and aching eyes, with tears "pouring" from the left eye. JSF at 10 ¶ 39; Tr. at 1472.

On March 28, 2018, Dr. Silbert wrote a letter on Ms. Fritz's behalf in which he reiterated Ms. Fritz's limitations and expressed his opinion that "[he] do[es] not feel there are accommodations that could help her to return to work successfully." JSF at 10 ¶ 40; Tr. at 978. In support of his opinion, he stated, *inter alia*, that "[Ms. Fritz's] vision and ocular function continuously impair her ability to see in a normal fashion whether sitting, standing, or walking." *Id.* (emphasis omitted). Moreover, as a result of her medical infirmities, Dr. Silbert concluded that "during reading, writing, or computer tasks she would be prone to mistakes, skipping lines or words or numbers. She also would be prone to tripping or falling whether walking on flat surfaces, carpeting or stairs." *Id.* Finally, Dr. Silbert did not expect "any improvement in her visual status over time or with additional treatments." *Id.*

On May 23, 2018, Ms. Fritz reported for an eye exam with Dr. Silbert. JSF at 10 ¶ 41; Tr. at 1197–1202. Ms. Fritz had black circles in her vision and double vision; although the prism helped with the double vision, it did not fully take the double vision away. JSF at 10 ¶ 41; Tr. at 1197–1202. Ms. Fritz reported that it took her eyes "two hours to focus normally." JSF at 10 ¶ 41; Tr. at 1197–1202. She also noted that her distance and near vision were not as good. JSF at 10 ¶ 41; Tr. at 1197–1202.

On July 25, 2018, Dr. Silbert wrote another letter on Ms. Fritz's behalf. He wrote that "she continues to suffer from debilitating double vision and dry eyes from thyroid disease" and expressed that this is a "permanent condition". JSF at 10–11 ¶ 42; Tr. at 1185.

In this letter, Dr. Silbert further explained that, while patching one eye would eliminate the double vision problem, it would likely not translate into significant visual and functional

8

improvement because she would sacrifice the sight in one eye completely, resulting in the loss of significant peripheral vision as well as the ability to have any depth or stereo vision. JSF at 10–11 ¶ 42; Tr. at 1185. As a result, "walking up and down steps, curbs, or any other uneven surface" would be "potentially quite risky." Tr. at 1185. Even if she "could sit at a desk and look around with one eye," she would experience a "major challenge" with "moving, walking, and driving safely." *Id.*

On December 6, 2018, Ms. Fritz reported that her double vision had gotten worse. JSF at 11 ¶ 43; Tr. at 1191.

On February 26, 2019, Ms. Fritz was again seen with swollen eyes, greater on the left side, which had tears "pouring" out. JSF at 11 ¶ 45; Tr. at 1213.

On June 5, 2019, Ms. Fritz presented for an eye exam with Dr. Cronin. JSF at 11–12 ¶ 46; Tr. at 1466. During the exam, she reported some difficulties with the Fresnel prism along with exposure keratoconjunctivitis bilaterally, for which she wanted to have plugs put in. JSF at 11–12 ¶ 46; Tr. at 1466.

A week later, at another eye exam with Dr. Silbert, Ms. Fritz reported that she "[did] not drive much at all anymore." JSF at 12; ¶ 47; Tr. at 1460. She reported that her vision was "not good" and that, although she was using the prism, her double vision remained. JSF at 12; ¶ 47; Tr. at 1460.

### 2. Disability Application

On July 13, 2016, Ms. Fritz filed a Title II application for a period of disability and disability insurance benefits, alleging disability beginning December 18, 2015. Tr. at 15. The claim was initially denied on January 12, 2017 and again denied on reconsideration on August 25, 2017. *Id.*

On September 6, 2017, Ms. Fritz filed a written request for a hearing. *Id.*

The initial hearing was held on July 5, 2018, at which Ms. Fritz testified. *Id.* Impartial vocational expert James Porter testified telephonically at this hearing. *Id.* Supplemental hearings were then held on January 31, 2019 and July 9, 2019. *Id.* Impartial medical expert Louis Fuchs, M.D., an ophthalmologist, and James Porter, an impartial vocation expert, testified telephonically at the January 31st supplemental hearing. *Id.* Bernard D. Zuckerman, an impartial ophthalmological medical expert, and Dennis J. King, an impartial vocational expert, testified telephonically at the July 9th hearing. *Id.*

At each hearing, Ms. Fritz was represented by her attorney. *Id.*

On September 27, 2019, Administrative Law Judge Matthew Kuperstein ("ALJ Kuperstein") issued a decision denying Ms. Fritz disability insurance benefits, *id.* at 15–29, and Ms. Fritz filed a request with the Appeals Council for review of the ALJ's decision, *id.* at 1.

On June 30, 2020, the Appeals Council denied the request and affirmed the ALJ's decision. *Id.* at 1–5.

### 3. ALJ Decision

On September 27, 2019, ALJ Kuperstein issued his decision denying Ms. Fritz disability insurance benefits. *Id.* at 15–29.

At Step One of the sequential evaluation, the ALJ found that Ms. Fritz had engaged in substantial gainful activity during the period of December 18, 2015 (the alleged onset date), through December 31, 2016. *Id.* At Step Two, the ALJ found that Ms. Fritz had the following severe medically determinable impairments: thyroid eye disease/Graves' Ophthalmology, diplopia. *Id.* At Step Three, the ALJ found that Ms. Fritz did not have an impairment or

combination of impairments that met or medically equaled the severity of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* at 19–20.

At Step Four, the ALJ determined that Ms. Fritz had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with the following non-exertional limitations: she needs to be limited to work that requires no climbing of ladders, ropes, or scaffolds; she needs 25 percent more time to read documents than an ordinary worker; and she needs to be able to avoid exposure to hazards such as heights, the operation of motor vehicles, or work that requires the use of depth perception. *Id.* at 20–26. He also determined that Ms. Fritz is unable to perform any past relevant work. *Id.* at 27.

At Step Five, the ALJ determined that, given Ms. Fritz's age, education, work experience, and RFC, she could perform work that exists in significant numbers in the national economy. *Id.* at 27–28. The ALJ relied upon the testimony of an impartial vocational expert that someone with Ms. Fritz's RFC could perform the following occupations, including: janitor, packer, dietary aide. *Id.* at 28.

### B. Procedural History

On August 21, 2020, Ms. Fritz filed this appeal. Compl.

On April 12, 2021, Ms. Fritz moved to reverse the decision of the Commissioner. *See* Pl. Mem.

On July 12, 2021, the Commissioner moved to affirm the decision. *See* Gov't Mem.

## II.   STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court reviewing a disability determination "must determine whether the Commissioner's conclusions 'are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard.'" *Schaal v. Apfel*, 134 F.3d 496,

501 (2d Cir. 1998) (quoting *Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997)); *see also Moreau v. Berryhill*, No. 17-CV-396 (JCH), 2018 WL 1316197, at *3 (D. Conn. Mar. 14, 2018) ("[T]he court may only set aside the ALJ's determination as to social security disability if the decision 'is based upon legal error or is not supported by substantial evidence.'" (quoting *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998))).

"Substantial evidence is 'more than a mere scintilla.'" *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (*per curiam*) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)). "'It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Moran*, 569 F.3d at 112 (quoting *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008)); *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) ("Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It is a "very deferential standard of review—even more so than the 'clearly erroneous' standard." *Brault*, 683 F.3d at 448 (citing *Dickson v. Zurko*, 527 U.S. 150, 153 (1999)).

## III.    DISCUSSION

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant is disabled under the Social Security Act, an ALJ must perform a five-step evaluation. As the agency explains:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled . . . ;

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled . . . ;

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled . . . ;

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled . . . ;

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled . . . .

20 C.F.R. § 404.1520(a)(4).

Ms. Fritz argues that the ALJ erred in this analysis, as he allegedly failed to perform an appropriate analysis of Ms. Fritz's allegations of pain, as relevant to the severity of her alleged spinal impairment, *see* Pl. Mem. at 7–10; improperly gave little weight to the opinions of Ms. Fritz's long-time treating physicians, *see id.* at 10–16; and failed to consider the full record regarding Ms. Fritz's ability to perform physical exertion over the light level, as well as her need for additional time off-task time as a result of her visual impairment, *see id.* at 16–18.

The Court will address each of these arguments below.

### A.  Step Two: Severity of Spinal Impairment

A claimant seeking Social Security benefits bears the burden of showing that the claimant has a medically severe impairment or combination of impairments. *See Bowen v. Yuckert*, 482

U.S. 137, 146 n.5 (1987). "The existence of a medically determinable [ ] impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings." *Merancy v. Astrue*, No. 10-CV-1982 (MRK) (WIG), 2012 WL 3727262, at *7 (D. Conn. May 3, 2012) (internal citation omitted); *see also* 20 C.F.R. § 404.1521 (a medically determinable impairment must result "from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques"). It is the plaintiff's burden to provide "medical evidence which demonstrates the severity of [his or] her condition." *Merancy*, 2012 WL 3727262, at *7 (citing *Bowen*, 482 U.S. at 146); *see also Wells v. Comm'r of Soc. Sec.*, 338 F. App'x 64, 66 (2d Cir. 2009) ("The claimant bears the burden of proving the first four elements and the Commissioner bears the burden on the fifth element.").

At Step Two, if the ALJ finds any impairment to be severe, "whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence." *Jones–Reid v. Astrue*, 934 F. Supp. 2d 381, 402 (D. Conn. 2012), *aff'd*, 515 F. App'x 32 (2d Cir. 2013) (quoting *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801 (6th Cir. 2003)); *see also Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995) ("Step Two may do no more than screen out *de minimis* claims." (citation omitted)).

Here, the ALJ found that Ms. Fritz's thyroid eye disease/Graves' ophthalmology and diplopia were severe, and then proceeded with the sequential analysis; as a result, any error in the ALJ's determination of the status of Ms. Fritz's cervical degeneration as non-severe is harmless. *See Stanton v. Astrue*, 370 F. App'x 231, 233 n.1 (2d Cir. 2010) (finding harmless error where "the ALJ did identify severe impairments at step two, so that [the appellant's] claim proceeded through the sequential evaluation process"); *Kennedy v. Colvin*, No. 3:15-CV-1205 (VAB), 2018 WL 1505573, at *9 (D. Conn. Mar. 27, 2018) ("[T]he ALJ proceeded to the next step of the

evaluation process—even if not for the reasons that [the claimant] now argues it should have proceeded—and as a result, any error in the ALJ's determination of the status of [the claimant's disability] is harmless.").

Accordingly, Ms. Fritz's motion to reverse on these grounds will be denied.

### B.  Step Four: Residual Functional Capacity

In the context of Social Security determinations, residual functional capacity is defined as "what an individual can still do despite his or her limitations." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (internal quotation omitted). "Ordinarily, [residual functional capacity] is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the [ ] assessment [of residual functional capacity] must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Id.* Residual functional capacity is "an assessment based upon all of the relevant evidence . . . [which evaluates a claimant's] ability to meet certain demands of jobs, such as physical demands, mental demands, sensory requirements, and other functions." 20 C.F.R. § 220.120(a) (2009). An ALJ must consider both a claimant's severe impairments and non-severe impairments in determining the claimant's residual functional capacity. 20 C.F.R. § 416.945(a)(2) (2012); *De Leon v. Sec'y of Health & Hum. Servs.*, 734 F.2d 930, 937 (2d Cir. 1984).

Ms. Fritz argues that the ALJ erred in analysis of residual functional capacity, as he afforded little to no weight to Ms. Fritz's long-time treating physicians. *See* Pl. Mem. at 10–16. She also argues that the ALJ failed to appropriately consider the time off-task that Ms. Fritz requires due to her reduced reading speed; need for breaks to lubricate her eyes and manually close her eyes; and need to move her entire head to change her field of vision. *Id.* at 16–18.

The Commissioner argues, in response, that the ALJ appropriately afforded little to no weight to the treating physicians' opinions because they were unsubstantiated by and inconsistent with the record as a whole, including evidence of Ms. Fritz's daily activities. Gov't Mem. at 6–12. In the Commissioner's view, substantial evidence supports the ALJ's assessment of residual functional capacity, even in light of Ms. Fritz's back and neck pain, as the record shows that she has not received ongoing medical treatment for her cervical degenerative disease and engages in daily activities that are inconsistent with the alleged extent of her impairments. *See id.* at 12–14. The Commissioner also contends that the ALJ properly found that the medical records did not support an ongoing need for Ms. Fritz to be off-task more than determined by the ALJ. *See id.* at 10–11.

The Court disagrees.

"An ALJ in a social security benefits hearing has an affirmative obligation to develop the record adequately." *Herminia Torres v. Berryhill*, No. 3:17-CV-605 (DFM), 2019 WL 1416989, at *3 (D. Conn. Mar. 29, 2019) (internal citations omitted); *see also Schaal*, 134 F.3d at 505 ("[E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] *sua sponte.*"). This duty exists, even if the claimant has counsel. *See Delgado v. Berryhill*, No. 3:17-CV-54 (JCH), 2018 WL 1316198, at *6 (D. Conn. Mar. 14, 2018); *see also Pratts,* 94 F.3d at 37 ("It is the rule in our circuit that 'the ALJ, unlike a judge in a trial, must [her]self affirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding.' This duty . . . exists even when . . . the claimant is represented by counsel." (citations omitted) (alterations in original)).

As part of this "affirmative obligation to develop the record adequately," the opinion of a treating physician[2] will receive "controlling weight", if the ALJ finds that it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with [ ] other substantial evidence in [the] case record[.]"  20 C.F.R. § 404.1527(c)(2) (2017).[3] Generally, the agency gives "more weight" to treating physicians, as opposed to a consulting physician a patient sees once, because they are best able to provide a "detailed" and "longitudinal" picture of a claimant's impairment. *Id.*; *see also Moreau*, 2018 WL 1316197, at *8 ("Because the treating physician has the opportunity to develop an informed opinion as to the physical status of a patient over the course of treatment, the treating physician's opinion is . . . more reliable than that of an examining physician . . . ." (internal quotation marks and citations omitted)).

The Commissioner does not contend that either the opinion of Dr. Silbert or Dr. Cronin is unsupported by medically acceptable clinical and laboratory diagnostic techniques. Rather, the Commissioner contends that these opinions are not entitled to significant weight, consistent with the ALJ's opinion, because they are unsubstantiated by the record. Gov't Mem. at 6–12. For example, in the final decision, the ALJ states that the opinion of Dr. Cronin is not entitled to significant weight because it lacks "any explanation of the basis for the exertional, manipulative or postural limits that Dr. Cronin described in [Ms. Fritz's] actual examination notes." Tr. at 26. As to Dr. Silbert, the ALJ states that the opinion is not entitled to significant weight because it

---

[2] A "treating" physician is defined, under the regulations as an "acceptable medical source" who has an "ongoing treatment relationship" with a claimant. 20 C.F.R. § 404.1527(a)(2) (2017).

[3] The standard articulated in this section of the Federal Regulations applies to claims filed before March 27, 2017. *See* 20 C.F.R. § 404.1527(c)(2) (2017) ("For claims filed . . . before March 27, 2017, the rules in this section apply."). For claims filed on or after March 27, 2017, the rules in 20 C.F.R. § 404.1520c apply. *Id.* Ms. Fritz filed her Title II application for a period of disability and disability insurance benefits on July 13, 2016, Tr. at 15, and therefore, her claim will be assessed under the standard in 20 C.F.R. § 404.1527(c)(2).

does not "describe any specific restrictions" and "fail[s] to provide a function-by-function assessment." *Id.* at 25.

In so doing, the ALJ glosses over Dr. Silbert's explanation for his opinion, an opinion supported by the medical evidence, that:

> Despite numerous orbital, muscle and lid surgeries over approximately 20 years, [Ms. Fritz] has essentially constant double vision in all fields of gaze including primary gaze.
>
> She has scarred upper lids and cannot completely close them despite multiple surgeries to help correct her. Her corneas have chronic ongoing dryness despite using lubricating drops 6-8 times a day and ointment at bedtime. Her vision and ocular function **CONTINUOUSLY** impair her ability to see in a normal fashion whether sitting, standing, or walking.

*Id.* at 978 (emphasis in original). Moreover, as a result of these medical infirmities, Dr. Silbert concluded that "during reading, writing, or computer tasks she would be prone to mistakes, skipping lines or words or numbers. She also would be prone to tripping or falling whether walking on flat surfaces, carpeting or stairs." *Id.* Finally, Dr. Silbert did not expect "any improvement in her visual status over time or with additional treatments." *Id.*

While Dr. Silbert's substantiated opinions regarding Ms. Fritz's medical condition, one developed over years of treating her, was given "little weight," the ALJ did give the opinion of a consulting physician, Dr. Zuckerman, "significant weight," *id.* at 25–26, including whether the wearing of an eye patch would resolve Ms. Fritz's double vision problem for purposes of her working, *see id.* at 57. The ALJ's decision to give Dr. Zuckerman's opinion about the alleged efficacy of wearing an eye patch "significant weight," however, does not account for Dr. Silbert's opinion that he did not expect "any improvement in her visual status over time or with additional treatments," *id.* at 789, because she would sacrifice the sight in one eye completely, resulting in the loss of significant peripheral vision as well as the ability to have any depth or

stereo vision, *id*. at 1185. As a result, "walking up and down steps, curbs, or any other uneven surface" would be "potentially quite risky." *Id.* And even if she "could sit at a desk and look around with one eye," she would experience a "major challenge" with "moving, walking, and driving safely." *Id.*

Although, in general, courts "defer to the Commissioner's resolution of conflicting evidence," *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012), an ALJ must articulate "good reasons" for the weight given to treating source opinions, *Camille v. Colvin*, 652 F. App'x 25, 27 (2d Cir. 2016) (summary order) (internal citation omitted); *see also Medina v. Comm'r of Soc. Sec.*, 831 F. App'x 35, 36 (2d Cir. 2020) (summary order) ("An ALJ must 'give good reasons in its notice of determination or decision for the weight it gives the treating source's medical opinion.'" (quoting *Halloran*, 362 F.3d at 32 (internal citations omitted))). Failure to provide "'good reasons' for not crediting the opinion of a claimant's treating physician" can be a basis for remand. *Burgess*, 537 F.3d at 129–30 (quoting *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)); *see also Estrella v. Berryhill*, 925 F.3d 90, 96 (2d Cir. 2019) ("If 'the Commissioner has not [otherwise] provided good reasons [for its weight assignment],' we are unable to conclude that the error was harmless and consequently remand for the ALJ to 'comprehensively set forth [its] reasons.'" (citing *Halloran*, 362 F.3d at 33) (internal citation and quotation marks omitted)).

Here, the ALJ failed to provide such reasons. The reasons for which the ALJ afforded little weight to Dr. Silbert (and perhaps Dr. Cronin's opinion as well)[4] amounted to "cherry

---

[4] For example, instead of supplementing the record as to Dr. Cronin's assessment that Ms. Fritz needed to limit movement of her head and neck, the ALJ afforded "significant weight" to the opinion of Dr. Fuchs: a non-treating physician with a specialty in orthopedic surgery, *see* Tr. at 1186–88, who, according to his own testimony, was "unable to decipher" the results of a physical examination from Yale New Haven Hospital for the period of December 18, 2014 to July 28, 2016, *see id.* at 91; *see also id.* at 818–85 (records from Yale New Haven Hospital).

picking" evidence from non-treating physician testimony as a "benchmark" against which to find that treating source opinions were inconsistent with the record as a whole. *White v. Berryhill*, No. 3:17-CV-01310 (JCH), 2018 WL 2926284, at *4 (D. Conn. June 11, 2018) (citing *Dowling v. Comm'r of Soc. Sec.*, No. 5:14-CV-0786 (GTS/ESH), 2015 WL 5512408, at *11 (N.D.N.Y. Sept. 15, 2015) ("The fundamental deficiency involved with 'cherry picking' is that it suggests a serious misreading of evidence, or failure to comply with the requirement that all evidence be taken into account, or both.")); *see also Davenport v. Saul*, No. 3:18-CV-1641 (VAB), 2020 WL 1532334, at *32 (D. Conn. Mar. 31, 2020) (citing the same). The ALJ's decision therefore did not appropriately assess the weight to be given to the treating physicians' opinions, as required by agency regulations. Moreover, the record does not reflect that the ALJ obtained the information he determined to be lacking to support the treating physicians' opinions. Rather, the ALJ dismissed the treating physicians' conclusions as to disability without further investigation.[5]

---

Even if the ALJ did not have an affirmative duty to request additional evidence to complete the record, there is substantial evidence in the record to support Dr. Cronin's assessment as relevant to the claimant's limitations on movement of her back and neck including, as the ALJ is required to consider, the claimant's report of pain. *See* Soc. Sec. Rul. 16-3p ("The [ALJ's] determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."). In the medical records from Yale New Haven that Dr. Fuchs was unable to decipher, Ms. Fritz reported "pain related to cervical disc disease." Tr. at 826. Following imaging for this reported pain, Dwight Ligham, M.D., found multilevel degenerative disc disease and annual tears at C5-C6 and C6-C7, which the doctor reported were the likely source of specific pain generators. *Id.* at 820. As noted throughout the record, Ms. Fritz has undergone regular trigger point injections for pain related to cervical degenerative disc disease. *See also id.* (Ms. Fritz continues to benefit from trigger point injections every three months); *id.* at 826 (Ms. Fritz requests repeat trigger point injection).

[5] While the Commissioner need not accept conclusory statements as to disability, even from a treating physician, *see Greek v. Colvin*, 802 F.3d 370, 374 (2d Cir. 2015) ("The ultimate determination of whether a person has a disability within the meaning of the Act belongs to the Commissioner."), the obligation to develop the record adequately remains, *see Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) ("A hearing on disability benefits is a non-adversarial proceeding," and as such, "the ALJ generally has an affirmative obligation to develop the administrative record."). The ALJ failed to fulfill that obligation here. *See Hartnett v. Apfel*, 21 F. Supp. 2d 217, 221 (E.D.N.Y .1998) ("[I]f an ALJ perceives inconsistencies in a treating physician's reports, the ALJ bears an affirmative duty to seek out more information from the treating physician and to develop the administrative record accordingly." (internal citations omitted)); *see also Davenport*, 2020 WL 1532334, at *29 ("[I]f an ALJ perceives inconsistencies in a treating physician's reports, the ALJ bears an affirmative duty to seek out more information from the treating physician and to develop the administrative record accordingly." (citing *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999)).

This Court is not positioned to appropriately weigh the various treating physicians' opinions or otherwise determine the functional limitations of a Social Security disability claimant. "The Court's role in reviewing a disability determination is not to make its own assessment of the plaintiff's functional capabilities; it is to review the ALJ's decision for reversible error." *Pacheco v. Saul*, No. 3:19-CV-00987 (WIG), 2020 WL 113702, at *8 (D. Conn. Jan. 10, 2020) (citing *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)). Accordingly, the Court finds that additional administrative proceedings are required.

On remand, the ALJ shall develop the record as necessary to obtain information as to Plaintiff's functional limitations through whatever method is deemed appropriate and thoroughly explain any findings in accordance with the regulations. *Id.* ("On remand, the ALJ should develop the record as necessary to obtain opinions as to Plaintiff's functional limitations from treating and/or examining sources, obtain a consultative psychiatric examination and/or a medical expert review, and/or obtain a functional capacity evaluation and thoroughly explain his findings in accordance with the regulations."). The Commissioner also shall address the other claims of error not discussed herein. *See Casanova v. Saul*, No. 3:19-CV-00886 (TOF), 2020 WL 4731352, at *6 (D. Conn. Aug. 14, 2020) ("On remand, [. . .] the ALJ shall consider the other claims of error not discussed in this decision."); *Pacheco*, 2020 WL 113702, at *8 ("On remand, the Commissioner will address the other claims of error not discussed herein.").

Accordingly, the ALJ's decision will be remanded to the Commissioner for further administrative proceedings consistent with this ruling.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff's motion to reverse is **DENIED**, and her alternative motion to reverse and remand for a new hearing is **GRANTED**.

The Commissioner's motion to affirm is **DENIED**. The Commissioner's decision is

**VACATED** and **REMANDED** for proceedings consistent with this decision.

**SO ORDERED** at Bridgeport, Connecticut, this 17th day of December, 2021.

          /s/ Victor A. Bolden
         Victor A. Bolden
         United States District Judge